OPINION OF THE COURT
Renee R. Roth, S.
This proceeding to appoint a guardian (Mental Hygiene Law *150 art 81) for a putative contestant of the will of Bernice B. was tried before a jury. The case, apparently the first article 81 jury trial in a Surrogate’s Court, required the court to charge the jury on a substantive area of probate law not covered by the Pattern Jury Instructions for article 81 proceedings.
The competing interests at stake are also quite unusual. On the one hand, an interest that is the beneficiary’s sole known source of support may be destroyed by the beneficiary herself if she is permitted to continue to act as a litigant. On the other hand, also in the balance is the beneficiary’s fundamental right to determine her own course as a party to a court proceeding.
The petition alleges that KB is an incapacitated person in need of a guardian or such other safeguard as may be available under article 81. The court has jurisdiction under Mental Hygiene Law § 81.04 (b), since KB is a resident of this county who has an interest in an estate pending in this court.
The background of this proceeding has already been traced in detail in decisions arising from the probate contest (Matter of Bernice B., 176 Misc 2d 550; Matter of Bernice B., NYLJ, Feb. 10, 1997, at 30, col 2). To the extent relevant here, the findings required under Mental Hygiene Law § 81.15 (c) are as follows.
Mrs. B. died on February 28, 1996, survived by three adult daughters, Elinor B., KB and Anne B. Under the propounded instrument, dated May 22, 1995, decedent left her estate valued at approximately $3 million as follows: 25% each outright to Elinor and Anne (less than the 33% that each would receive in intestacy); 14% in trust for her grandchildren; and the remaining 36% in trust for KB for life, with income payable to her directly or indirectly to the extent necessary or appropriate as determined by the trustee and as much as 15% of trust principal payable to her each year for her support and welfare, also as determined by the trustee. Elinor and Anne were named as executrices; Anne was named trustee of the trust for the grandchildren; and a family friend, Edward R. Halpert, was named trustee of the trust for KB.
It is noted that the will contains an in terrorem clause which became significant early in the probate proceeding after KB filed a barrage of pro se motions contending that her mother not only had been incompetent at the time the will was executed, but also, had been murdered by Elinor and Anne (during her extended visit with Anne and her family in Seattle) in complicity with the New York attorney who had drafted the *151 will. After KB pressed the Seattle authorities to investigate her charges concerning Mrs. B.’s death, the coroner there examined decedent’s remains and concluded that she had died of natural causes. But the coroner’s findings failed to deter KB from continuing to allege, in court papers and other declarations, that decedent had been the victim of foul play and that a homicide investigation was ongoing in Seattle. KB also continued to level charges that the will was a sham and that her sisters and an ever-widening group of other alleged wrongdoers (ultimately including all levels of court personnel) had conspired either to harm Mrs. B. in various ways during her lifetime or to steal from her estate thereafter.
On July 15, 1996, about four months after the will was propounded, Elinor, by order to show cause, commenced the present proceeding under Mental Hygiene Law § 81.07, alleging that a guardian was needed to manage KB’s interests in their mother’s estate. The primary ground was Elinor’s concern that, if left to her own devices, KB would proceed to file spurious objections to probate of the will and thereby trigger the in terrorem clause at the cost of her beneficial interest in the estate. It is observed that KB’s loss in this respect would result in Elinor’s financial gain (since KB’s lapsed share would be divided among Elinor, Anne and the trust for the grandchildren). Moreover, Elinor could only have profited from a successful challenge to the will, since her interest under the will was less than she would receive in intestacy. But, despite her financial self-interest to the contrary, Elinor urged that a guardian be appointed to prevent KB from formally objecting to probate.
At the commencement of the Mental Hygiene Law proceeding, the court appointed a lawyer, May Glazer, to serve as court evaluator (Mental Hygiene Law § 81.09). Ms. Glazer rendered a preliminary report in which, among other things, she recommended that a guardian ad litem be appointed to represent KB in the probate proceeding to help minimize KB’s disruptions to the process, to assess the validity of the will and to protect KB from acting against her interests. That recommendation was supported by the proponents of the will in a formal application and by a record replete with evidence that KB had been acting in counterproductive ways both in and out of court. Such evidence included, as but two examples, KB’s continuous chaotic outbursts during SCPA 1404 examinations and her false alarms to 911 operators, to whom she among other things reported that Elinor’s visits to decedent’s apart *152 ment (to attend to her duties as a preliminary executrix) were burglaries in progress.
By order dated February 4, 1997, this court determined that KB was a “[plerson under disability” within the meaning of SCPA 103 (40) and thus in need of a guardian ad litem (GAL) to appear along with her in the probate proceeding (SCPA 402, 403). Ms. Glazer was selected to act in such capacity, in view of her extensive background in the area of trusts and estates as well as her familiarity with the companion proceeding under the Mental Hygiene Law. Finally, Ms. Glazer was authorized to retain a psychiatrist to assist her in evaluating KB’s mental capacity.
After completing her examinations under SCPA 1404, Ms. Glazer, as GAL, reported that she had negotiated a compromise under which all of the trust’s net income would be payable to, or for, KB (rather than only such of it as the trustee might deem to be “necessary or appropriate”). Ms. Glazer recommended the settlement in view of her conclusion that there was no viable ground to object to the will. But KB opposed any settlement of the probate proceeding and made it clear that she was determined to contest the will. KB’s resistence to the agreement recommended by her GAL required the court to decide whether the GAL could bind KB to a settlement against her wishes in the absence of a formal adjudication that she was incapable of appearing as a party. By decision dated April 7, 1998, it was determined that a GAL could not enter into a settlement over her ward’s opposition unless or until the latter was adjudicated to be “incapacitated” under procedures affording the ward all of the protections prescribed by the Mental Hygiene Law (Matter of Bernice B., 176 Misc 2d 550, supra). Accordingly, a trial was scheduled on the objections raised by KB to the appointment of a Mental Hygiene Law guardian. On May 19, 1998, the court appointed an attorney to represent her for purposes of such trial (Mental Hygiene Law § 81.10 [b], [c] [2]). As requested by KB, a jury was impanelled (Mental Hygiene Law § 81.11 [f]) to determine whether she (as the allegedly incapacitated person [AIP]) required protection because of “incapacity” within the meaning of Mental Hygiene Law § 81.02 (b).
Testimony was taken over the course of six days. At the conclusion of the trial, the court reserved decision on the AIP’s motion for an order sealing the court records of the proceeding. In the absence of good cause, the application is denied (Mental Hygiene Law § 81.14 [b]).
*153 Petitioner’s witnesses included Abraham Siegel (the lawyer who had drafted Mrs. B.’s will and supervised its execution); Ms. Glazer; Anne; Elinor; and Dr. Howard Owens, the psychiatrist who had been retained to help evaluate the AIP. The AIP’s witnesses included herself and Harvey Corn, a partner of her court-appointed counsel, who testified as an expert in the field of trusts and estates.
Petitioner’s proof established the following. Testatrix was a lawyer who had achieved distinction in government service during a lengthy career. Although in her later years she had suffered various ailments attributable to advancing age, testatrix clearly retained her mental faculties to the end. She was alert to the different circumstances of her children, financial and otherwise, particularly the special needs of KB, whose relationships with her parents and siblings had for decades been troubled and had at one point been resolved only when her parents went to Family Court and obtained an order of protection against her. Their ongoing payments of KB’s rent thereafter demonstrate that Mr. and Mrs. B. had, nonetheless, remained concerned for KB’s welfare during the balance of their lives. Their concern for KB was understandable, given her continuing failure to gain employment after her graduation from medical school. Likewise understandable were the testatrix’s choices to channel testamentary benefits to KB through the protective devices of a trust and to give her a share larger than the share allotted to each of her sisters, whose future prospects were less problematic. The proof further established that any neurological impairment suffered by decedent as she aged had not prevented her — even months after she executed the will — from, for example, reminiscing with old friends or, as another example, reading the New York Times and discussing current events with one of her grandchildren.
In addition to testifying to the facts bearing upon the validity of the will, petitioner’s witnesses attested to numerous episodes indicating that KB was prone to imagine wrongdoing by others and to act upon such imaginings in ways that exposed her to liability for defamation, or that caused needless expense or delay to the estate, or that were otherwise contrary to her interests. The following are representative portions of such testimony.
Mr. Siegel recalled that on several occasions KB had brought the police to his offices on bogus charges that she had been assaulted by him or his staff; that she had attempted to interfere *154 with sales of estate property by falsely advising Christie’s (the auction house retained for the purpose) that the preliminary executrices had no authority to act on behalf of the estate and were being “investigated” by the Internal Revenue Service and District Attorney’s office; that KB had filed complaints against him with the Bar Association and in Supreme Court, falsely attributing to him a record of larceny, fraud, perjury, subrogation of perjury, and “matricide” and seeking, damages of some $1.5 billion from him and others (including two of the policemen whom she had called to Mr. Siegel’s offices, as well as the stenographer who had provided the transcript of a deposition [SCPA 1404] in the probate proceeding); and that KB had claimed that the District Attorney of New York County had deputized her to aid in his purported investigation into her mother’s murder in Seattle.
Ms. Glazer testified that KB had responded to her with suspicion and hostility almost from the outset of her appointment as court evaluator; that she had received a series of harassing telephone calls from KB, who had accused her of “raping” the estate and had threatened, among other things, to bring criminal charges against her and to expose her in the press, through the good offices of a “friend”, journalist Jimmy Breslin; that KB had similarly harassed a local radio personality-author (whose mother had drafted an earlier will for decedent that had also left KB’s share in trust) with threats of lawsuits and embarrassing calls to her publisher and editor; and that KB, having threatened to have Ms. Glazer disbarred, had made complaints against her to the Disciplinary Committee of the First Department and the Office of Court Administration (OCA). Indeed, KB had informed this court in writing that the OCA had withdrawn Ms. Glazer’s certification as a court evaluator.
Elinor testified that, within days of their mother’s death, KB began to threaten to have her and Anne arrested at the memorial service for decedent then being planned at the United Nations; that KB repeated such threats in calls to the organization that was sponsoring the service, which ultimately decided to withdraw its support; and that KB had not only called the police to decedent’s apartment while Elinor was in the process of attending to estate business there, but also, had repeatedly ordered phone service there to be disconnected, a nuisance that further interfered with Elinor’s work in administering the estate.
Anne recalled that, shortly after their mother’s death, KB had complained to the Washington Bar Association that Anne’s *155 husband, a lawyer, had been involved in a murder; that KB had asked the New York police and the New York branch of the FBI to investigate decedent’s death; that decedent had agreed to allow some friends of Anne’s to use her apartment for several weeks during a visit to New York, but that the friends had to leave the apartment after a series of 911 calls from KB (timed to be received by each new shift at the local precinct house) brought police to their door around the clock.
In addition to relating past events, Anne described an incident that occurred on the second day of the trial itself after KB’s abrupt departure from the courtroom shortly before the mid-day recess, which had been followed by sounds of a commotion in the outside hall. Anne testified that she had at the time been sitting outside the courtroom, waiting to be called as a witness, when KB wordlessly accosted her, hit her squarely in the face and then swiftly disappeared down the corridor.
Dr. Owens testified that he was a graduate of the College of Physicians and Surgeons of Columbia University, was board certified in psychiatry, forensic psychiatry, and forensic psychology, had been in practice for more than 25 years and was on the teaching faculty of three New York medical schools. He stated that his evaluation of KB was based upon his review of her voluminous filings, his interviews with the court evaluator, Elinor and Mr. Siegel, and his analysis of KB’s actions as recounted by the fact witnesses and as reflected in documents admitted into evidence, including several tape recordings of KB’s 911 calls. He noted that he had made efforts to interview KB, but she had refused to talk to him. Dr. Owens concluded that KB suffered from a serious delusional disorder marked by paranoia, feelings of grandiosity and lack of self-control, all of which prompted her to take actions adverse to her interests. With particular reference to KB’s interest in the probate proceeding, Dr. Owens further stated that this disorder significantly impaired her ability to manage such interest rationally and that she did not understand that she was thus disabled.
KB, on the other hand, testified that she was determined to contest the will on grounds of lack of testamentary capacity and due execution, fraud, and “criminally negligent pharmacological collusion.” She further testified that she thought she would prevail in such contest, but was aware that she might lose, if “no court of law is ready for the level of conceptual analysis that the scientific and medical community has come to long ago,” an analysis upon which she proposed to base her *156 case against the will. She stated that she was thus willing to lose even in the highest Court of the State for the sake of advancing her theory, which, as she described it, involved tissue diagnosis as evidence of “the brain death of new memory and comprehension components of testamentary capacity.” She added that she would be willing to suffer such loss even if the estate — appraised in some of her court papers at $260 million — were worth “eight trillion dollars” and even though she offered no evidence to show that she had any other means of support. She further stated that she would be calling scientists and Judges as experts to support her opposition to the article 81 petition. Mr. Corn, however, was her only expert witness. Although his testimony covered several aspects of the area of trusts and estates, Mr. Corn conceded that he was not familiar enough with the circumstances of the probate proceeding to know whether, as a matter of professional responsibility, he would continue to represent a client who insisted upon raising objections to such a will.
In preparing the instructions for the jury, the court discovered that the relatively new Pattern Jury Instructions charges for trials under article 81 (eff Apr. 1, 1993) were designed to suit only the fairly concrete issues typically raised in the Supreme Court, i.e., an AIP’s capacity to manage her assets and/or her ability to attend to her day-to-day personal needs. In this case, by contrast, the central question was less concrete and more complicated, since it concerned the AIP’s proposed course of conduct in another litigation and whether it would be harmful to her — i.e., it required the jury to consider certain procedural and substantive issues of law involved in a separate litigation. Although the Surrogate’s Court was given jurisdiction to appoint a Mental Hygiene Law guardian for a beneficiary of an estate, the type of issues that could arise here were not fully anticipated. In other words, this matter demonstrates that an article 81 proceeding (whether in this court or in another) may necessarily involve a jury in an inquiry far more complex and demanding than the framers of the statute had likely foreseen. Accordingly, a copy of this decision is being sent to the Committee on Pattern Jury Instructions with a recommendation that the Instructions be expanded to reflect the fact that a jury under article 81 may be required, first, to consider the merits of an AIP’s position as a claimant or defendant in a separate litigation and, second, to determine whether the AIP suffers from an incapacity which threatens to subvert the due settlement or assertion of such claim or defense.
*157 In the present case, it was necessary to instruct the jury on the law relevant to contested wills. Such instructions accordingly included a description of the components of testamentary capacity, and the burden of proof on such issue, the elements of a trust and the operation of an in terrorem clause.
The jury made the following findings: (1) that KB is unable to provide for her property management with respect to her interest in the estate of Bernice B.; (2) that KB is unable to adequately understand and appreciate the nature and consequences of such inability; and (3) that KB is likely to suffer economic harm because of her inability and lack of understanding. These findings are supported by clear and convincing evidence. The posttrial motion by the AIP to set aside the jury verdict is therefore denied (Mental Hygiene Law § 81.12).
The jury’s findings constitute a determination of “incapacity” for purposes of Mental Hygiene Law § 81.02 (b). It remains to be decided, however, whether appointment of a guardian for KB is necessary or whether she may, by some other means, be protected from harm in relation to her interest in the estate (Mental Hygiene Law § 81.16 [b]).
As indicated above, the petition had framed KB’s need for protection as essentially two-pronged, i.e., first, an imminent need to be restrained from taking self-destructive steps as a litigant and, second, an ultimate need for management of such benefits as she would receive pursuant to the disposition of that proceeding. There are several facts that are relevant to the first prong. The record is clear that, if allowed to proceed on her own behalf, KB will object to probate and thereby trigger the in terrorem clause. That would of course cause no major harm to KB if she had a realistic expectation of prevailing in such a contest. But the trial in effect confirmed the conclusions of the GAL in the probate proceeding that the testatrix was competent to make a will, i.e., that she understood the nature and extent of her property, the natural objects of her bounty and the provisions of the will (Matter of Kumstar, 66 NY2d 691, 692), and that KB could not prevail as an objectant to probate.
Clearly, with so much already established concerning the validity of the will and the perils of objecting to probate, there would appear to be no need to appoint a guardian to retrace the path already paved by the GAL. Accordingly, this decision constitutes the order of the court in the probate proceeding approving the settlement as recommended and conferring authority on the GAL to enter into it on behalf of KB.
*158 On the other hand, KB’s interest in the estate may well continue to require protection from her self-destructive impulses as a litigant even after the probate proceeding has been concluded. As the record shows, her endless filings of virtually incomprehensible and/or unfounded motions, subpoenas, warrants and discovery notices, among other submissions, are the products of a psychological disorder that has already cost the estate (and, through it, KB) dearly.
It is noted that, although the Mental Hygiene Law petition did not expressly seek appointment of a guardian for any litigation purpose other than to protect KB’s interests during the probate proceeding per se (although the proposed order and counterorder submitted by the parties would extend the guardianship beyond that proceeding, i.e., until the termination of the trust), petitioner additionally asked for “such other and further or different relief as * * * may [be] just and proper * * * including but not limited to any dispositional alternative authorized] by 81.16 [b].” In view of KB’s bizarre conduct as a litigant in this court, as well as the statutory mandate that the court devise a guardianship as necessary to assist the incapacitated person (Mental Hygiene Law § 81.16 [c] [2]), a guardian shall be appointed, by separate order, to accept on KB’s behalf any paper required to be delivered to her in connection with the administration of Mrs. B.’s estate or the trust for KB and to appear on her behalf and in her place for purposes of any further proceeding in this court.
Finally, the necessity for the appointment of a guardian to manage the funds that KB will ultimately receive from the estate has not been established; KB will not be receiving her beneficial interest outright, she appears to manage her outlays for daily discretionary costs and the testamentary trust’s provisions will in any event allow the trustee to pay KB’s regular expenses directly. Under these circumstances, appointment of such a guardian would appear to violate the Mental Hygiene Law mandate to limit intervention in the AIP’s life so far as her need for protection allows (Mental Hygiene Law § 81.01).